UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br>v.<br><br>ETUALE UIAGALELEI,<br><br>                     Defendant. | Case No. 2:13-cr-00436-JAD-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot Suppress – Dkt. #22) |

Before the court is Defendant Etuale Uiagalelei's ("Uiagalelei") Motion to Suppress Evidence for Fourth Amendment Violation (Dkt. #22), which the court set for an evidentiary hearing on July 31, 2014. The court has considered the motion, the government's Response (Dkt. #23), the government's Supplemental Response (Dkt. #25), Uiagalelei's Emergency Supplement to Motion (Dkt. #26), and the testimony at the evidentiary hearing. William Carrico appeared on behalf of Uiagalelei, and Robert Kneif appeared on behalf of the government. This matter was referred to the undersigned for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

## BACKGROUND

Uiagalelei is charged in an Indictment (Dkt. #1) returned December 10, 2013, with one count of felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g) and 924(a)(2). The indictment arises out of an arrest by officers of the Las Vegas Metropolitan Police Department ("LVMPD") on November 23, 2013. Uiagalelei was a passenger in a vehicle driven by Kang Kwon. During the course of the stop and follow-up investigation, Kwon was arrested on outstanding warrants, the passengers were detained, and evidence, including a revolver with wood grips found under the spare tire in the trunk, was recovered. Uiagalelei allegedly admitted

///

that he possessed the firearm, although he denied ownership. The officers were aware Uiagalelei was a convicted felon and arrested him for felon in possession.

In the current motion, Uiagalelei argues that officers lacked reasonable suspicion for the initial stop of the vehicle and that all evidence derived from the stop must be suppressed. No traffic violation occurred that justified the stop under Nevada law. The police report indicates that Kwon made a right-hand turn on Harmon and Koval and failed to maintain his lane while conducting the turn. Counsel believes the officer must have relied upon either NRS 484B.400 or NRS 484B.223 as a justification for the stop. Uiagalelei maintains that neither statute was violated.

Uiagalelei argues that the police violated his Fourth Amendment rights when they arrested him without probable cause. He contends that he was effectively under arrest the minute he was removed from the vehicle. All four occupants of the vehicle were ordered out, placed in handcuffs, and ordered to sit on the curb near police cars. Under these circumstances, any brief investigatory stop ended, and "a full blown arrest had taken place." Uiagalelei argues that there is a casual nexus between his detention and the recovery of evidence from the vehicle because the evidence would not have been recovered without the government's unconstitutional conduct. Because there is a causal link between the Fourth Amendment violation and recovery of the evidence, it must be suppressed as the fruit of the poisonous tree. Additionally, Uiagalelei seeks to suppress statements he made following his arrest admitting to possessing the gun as well as DNA evidence collected from him.

The government opposes the motion, claiming that on the date of the arrest, LVMPD received a report from a "citizen source" that there was "a subject at the Hard Rock who[] he believed to be a convicted felon in possession of a firearm." The informant reported that the suspect would be leaving in a "newer silver Honda Civic four-door sedan" and that the individual "was believed to have been seen placing a firearm into the trunk of the vehicle."

As a result of this report, LVMPD Officers Grantham and O'Connor went to the parking garage at the Hard Rock and observed a vehicle matching the description given by the citizen source. The officers conducted surveillance in an unmarked car and observed four individuals

inside. The officers contacted a marked patrol unit to conduct a traffic stop for an unsafe turning movement by failing to maintain lane. Officers Dennet and Campbell conducted a traffic stop in a marked patrol unit at 3950 Koval. The driver of the vehicle had an outstanding no-bail warrant and was taken into custody. The other three occupants were asked to get out of the vehicle. One of the male passengers told police the group was going to smoke narcotics.

Mr. Kwon stated the vehicle was registered in his father's name. As a result, officers decided to impound the vehicle and conducted an inventory search before it was towed. During the inventory search, papers containing personal identifying information of at least five persons not in the vehicle along with the personal property of at least ten people were found in the trunk. An expandable straight baton was found on the floorboard underneath the driver's seat, and a revolver with wood grips was found in the trunk under the spare tire.

The police conducted a records check and were aware that Uiagalelei was a convicted felon. Uiagalelei was given *Miranda* warnings and admitted he possessed the firearm, but denied he owned it. The officers applied for and obtained a state search warrant at about 1:40 a.m., on November 24, 2013. A Colt Officer's Model .38 caliber revolver with a six inch barrel was recovered from the trunk of the vehicle "pursuant to the search warrant." The search warrant also authorized a buccal swab to obtain epithelial cells from Uiagalelei's mouth.

The government maintains that the officers had reasonable suspicion to stop the vehicle for a violation of NRS 484B.223 and 484B.400. The government also argues the officers had lawful authority to impound and inventory the vehicle. The government disputes that Uiagalelei was immediately arrested when he was asked to get out of the vehicle. Rather, the government maintains that he was lawfully detained pursuant to a valid *Terry* stop until the firearm was discovered. Because the vehicle was not registered to the driver and was to be impounded, the passengers were asked to get out of the vehicle. The police were required to conduct an inventory to impound it. An inventory search would have required approximately thirty minutes had the officers not found evidence of crimes which extended the search. The government maintains that the officers appropriately took the driver into custody and detained the three passengers in handcuffs "to exercise command of the situation." The officers were aware, based

on the citizen tip, that a convicted felon in a vehicle matching the description of the vehicle that was stopped had been in possession of a firearm and might be in the trunk. Under these circumstances, the government maintains the officers acted out of reasonable concern for their safety and the safety of the public by maintaining exclusive control of the situation.

The government's supplemental response informed the court and opposing counsel that the "citizen source" was a confidential informant who had previously provided reliable information to LVMPD and had personal knowledge that Uiagalelei was a felon and had been in possession of a handgun. The supplement also indicates that Officers Grantham and O'Connor observed the Honda make a right turn from the right turn lane on Harmon to the #1, or left lane and then turn right, on Koval. The driver of the Honda signaled the right turn, but did not use a signal to switch from the right lane to the left lane. The Honda was stopped at about 10:57 p.m. The driver had an active warrant and was taken into custody. Two other passengers, a male and female, were released. Uiagalelei was handcuffed, and the interior and the trunk area of the car were searched because the car was to be towed, and the officers had received information from a known and previously reliable source that Uiagalelei had been seen with a gun and was a convicted felon. Within twenty minutes of the vehicle stop, a handgun was found under the spare tire. Officer Grantham advised Uiagalelei of his rights at 11:25 p.m., and Uiagalelei stated he was holding the gun for a friend.

Uiagalelei filed an emergency supplement indicating that defense counsel just learned information that may place the veracity of the affidavit underlying the state telephonic search warranted at issue. Specifically, the telephonic search warrant application stated that a citizen source had provided information that caused the car to be followed and stopped. The government provided a unit log and CAD report July 28, 2014. The CAD report indicates that the initial stop was at 22:57:23, and was transferred from a "467" (further investigation) to a "413" (firearm) at 23:14:35. The unit log indicates that the affiant for the search warrant application logged off the call at 03:27:11. In light of this additional information, counsel for Uiagalelei requested that the court permit him "to range broadly in his questioning" to fully develop the issues before the court.

4

At the evidentiary hearing, the government called LVMPD Officers Michael O'Connor and Robert Grantham. Defense counsel called Tamari Yohannes.

**I.     Testimony of Office O'Connor.**

Officer O'Connor has been employed by LVMPD for seven years and is currently on the Convention Center Problem Solving Unit ("PSU"), which he described as a gateway to becoming a detective. It is a plainclothes assignment, and an unmarked vehicle is assigned. He was a patrol officer before his current assignment. On November 23, 2013, he was working with PSU when he received a call from an informant known to him who had provided reliable information on more than one occasion. The informant had never provided inaccurate information. The informant's motivation for providing information was that he was being paid. The informant did not have any charges pending against him.

O'Connor received information from the informant days prior as well as on a real-time basis on the day in question. The informant told O'Conner in a phone call that there was a suspect at the Hard Rock with a group and was believed to have a firearm. The informant said two days prior, the same individual and another were committing street robberies, *i.e.*, robbing drug dealers and citizens on the street. The individual turned out to be Uiagalelei, who Officer O'Connor identified in open court.

After receiving the phone call from the informant, O'Connor and his partner, Grantham, went to the parking garage at the Hard Rock Casino. As they arrived, the informant said the group was leaving and that Uiagalelei had opened the trunk and placed something in it. O'Connor was in telephonic communication with the informant as the officers arrived at the Hard Rock garage. The officers observed a Honda Civic leaving the parking garage and coming down the exit ramp. The officers followed in their unmarked car as the Honda traveled westbound on Harmon until it reached Koval where it turned northbound. O'Connor observed the driver of the vehicle commit a traffic violation by failing to maintain his lane on the turn. He contacted  a uniformed patrol unit to conduct the stop and continued following the Honda until the patrol officers pulled the vehicle over.

5

1    Government's Exhibits P1, P2, and P3 were admitted in evidence.  They are aerial views
2    of the area of the traffic stop.  Officer O'Connor described the traffic violation as a wide turn.
3    The driver went from the right lane to the left lane, making the turn without signaling to get into
4    the left lane in violation of Nevada law which requires a signal for a lane change.
5    O'Connor and his partner were directly behind the patrol vehicle when the Honda was
6    pulled over.  An Asian male was in the driver's seat, a black female adult in the front passenger
7    seat, and a Hispanic male and Uiagalelei were in the rear.  The officers made contact with the
8    occupants as soon as the vehicle was pulled over.  All of the occupants were asked to get out of
9    the car, and they were detained because of the information that a firearm was in the car.  A
10   records check was conducted which indicated the driver had an outstanding warrant.  All of the
11   occupants of the vehicle were handcuffed because of the report of the firearm in the vehicle for
12   officer safety.  The male and female passengers were released at the scene after questioning.
13   On cross examination, O'Connor testified that he did not recall the exact time his shift
14   began on the date of the stop.  The informant called during the twenty-four-hour period the day
15   of the stop.  O'Connor was not sure, but he believed the informant called more than once.  The
16   informant was at the Hard Rock in the casino at the time he called and said he had information.
17   O'Connor described the procedure LVMPD follows when an informant is paid for information.
18   An informant calls if he has information for which he thinks police will pay.  Records are kept,
19   and a supervisor signs off before any payment is made.
20   O'Connor got the call from the informant five minutes before he and his partner drove to
21   the Hard Rock.  While they were driving, O'Connor called a marked unit to have it on standby.
22   He estimated the time between initially locating the Honda and having it pulled over was five
23   minutes.  The informant reported that Uiagalelei put something in the trunk.  O'Connor did not
24   know, but assumed based on the information his informant provided that the informant was in
25   the parking garage as he was talking on the phone.
26   None of the officers saw the group before they got into the Honda.  O'Connor again
27   described the traffic violation as a wide turn in which the driver of the vehicle went from the
28   right lane to the left lane without signaling at the corner of Koval and Harmon.  The officers in

the marked patrol unit who made the initial stop did not observe the traffic violation. O'Connor acknowledged that he would not routinely pull over a driver for an unsafe lane change, but this was the reason the Honda was pulled over.

O'Connor and his partner were immediately behind the patrol car and arrived at the stop simultaneously. O'Connor and his partner contacted the patrol officers as they were making contact with the occupants. O'Connor asked the patrol officers to have all of the occupants get out of the car. Everyone was immediately taken out of the car and put in handcuffs. Patrol Officers Dennett and Campbell were at the vehicle with the four subjects attempting to identify them. O'Connor estimated the firearm was located fifteen to twenty minutes after the initial stop. He called in a code 467 (traffic stop) for the initial stop and changed it to a code 413 (gun).

The inventory search was conducted by Officer Grantham, who is the case agent. Grantham was the ranking officer at the scene until detectives from the Firearms Division arrived. O'Connor was pretty sure that Grantham was the one who decided to inventory the vehicle and executed the search.

O'Connor talked to the driver and the female passenger. Grantham interviewed all four occupants, and O'Connor was there to witness *Miranda* and any statements made. O'Connor believed that all four occupants received *Miranda* warnings.

O'Connor reiterated that the inventory search was conducted fifteen to twenty minutes after the initial stop. The gun was found in the trunk as part of the inventory. Five to ten minutes after the inventory search began, Officer Grantham found the gun. It took fifteen minutes to conduct the inventory search, the purpose of which was to protect LVMPD and the community. LVMPD guidelines do not permit an inventory of every car stopped. An inventory search is permitted only if there is a hazard to the roadway, or if the driver cannot drive away. The registered owner of the vehicle was Kwon's father. O'Connor did not know if anyone contacted the father to find out if he wanted to pick up the vehicle. Grantham was interviewing Kwon when officers learned Kwon had warrants. Because Kwon was not the registered owner of the vehicle, he could not release the vehicle to allow someone else to drive it away. The fact that a son was driving a father's car "doesn't count."

1     A Hispanic male was in the back seat. O'Connor did not recall his name and did not put
2  his name in the report. The informant was the only way O'Connor connected Uiagalelei to the
3  firearm. Kwon was the only occupant who had keys to the vehicle. Kwon was arrested for false
4  documents and having an illegal weapon, a collapsible baton.

5     Uiagalelei was in the back seat. O'Connor believed that Uiagalelei was on the passenger
6  side behind the woman sitting in the front. The firearm was found in the wheel well of the trunk.
7  It was found after opening the trunk and lifting the wheel well. The officer strongly suspected
8  the firearm was in the trunk because of the tip received from the informant. As soon as officers
9  interviewed the Hispanic male and female, the only ones who were detained were Uiagalelei and
10 the driver. O'Connor did not recall if the female had some type of concealed weapon, like a
11 knife. The Hispanic male and female were allowed to leave after approximately twenty-five
12 minutes.

13    The detectives from the Firearms Unit were called after the firearm was discovered.
14 LVMPD policy is for the Firearms Division detectives to recover firearms. O'Connor did not
15 recall when the request for the Firearms Unit was made or when the firearms detectives arrived.
16 He cleared this call when the subjects were arrested, and the vehicle was impounded. He
17 remained at the scene at least an hour, perhaps two.

18    There were a number of officers and detectives on the scene--O'Connor and his partner,
19 two marked patrol units, two firearms detectives, O'Connor's sergeant, and the firearms
20 sergeant. The firearms detective arrested Uiagalelei. O'Connor also believed the firearms
21 detective interrogated Uiagalelei and got a telephonic search warrant. O'Connor told the
22 detective who applied for the search warrant what he needed to know. O'Connor told the
23 detective about his informant and asked if the detective could "keep him out of it." O'Connor
24 would never tell the detective the informant's name. O'Connor did not read the warrant.

25 **II.     Testimony of Officer Robert Grantham**.

26    Officer Grantham is currently assigned to the Tourist Crime Unit. On November 23,
27 2013, he was assigned to the Convention Center Command PSU in plainclothes. He was
28 involved in the series of events leading up to Uiagalelei's arrest. The silver Honda was stopped

by patrol officers.  He and O'Connor approached the vehicle and assisted getting the occupants out of the vehicle.  Grantham contacted all four of the occupants one at a time.  He believed he made initial contact with the driver, then the female, the male passenger, and finally Uiagalelei.  The stop was made one or two minutes before 11:00 p.m.  Grantham made contact with the driver for approximately five to six minutes and advised the driver of his *Miranda* rights.  He read the rights verbatim from an LVMPD-issued *Miranda* card.  Patrol officers conducted the records check which indicated the driver had warrants for his arrest.  When Grantham interviewed the driver, the driver also said that he possibly had bench warrants.

Grantham then interviewed the female while the officers were trying to identify the other occupants.  Grantham advised the female of her *Miranda* rights.  She was uncuffed and free to leave.  Grantham knew of her before the stop.  Grantham had an informant who said she was selling narcotics.

Grantham then interviewed the Hispanic male and identified him.  The Hispanic male was uncuffed and let go.  Uiagalelei was in handcuffs standing by waiting to be interviewed.

Grantham asked the driver of the vehicle whether there was anything illegal in the car.  The driver said no.  Grantham decided to do a quick inventory of the vehicle because the vehicle was going to be towed because the driver could not drive it.  Grantham initially searched large open compartments of the vehicle, then under the seats, and then the trunk.  He estimated that the initial search took approximately ten minutes and was done before he interviewed Uiagalelei.  The gun was found in the trunk under the spare tire.

Grantham interviewed Uiagalelei after advising him of his *Miranda* rights which he read verbatim from his LVMPD-issued card.  He read Uiagalelei *Miranda* rights at approximately 11:25 p.m., twenty-five to thirty minutes after the stop.  Grantham first asked Uiagalelei whether he had ever been arrested.  Uiagalelei responded he was an ex-felon.  Grantham asked Uiagalelei whether there was anything illegal in the trunk.  Uiagalelei denied there was.  Grantham then stated he found something in the trunk.  Uiagalelei responded it was not his, but that he was "holding it."  The word "gun" was not used in this exchange.  Grantham followed up and asked where Uiagalelei got the gun.   Uiagalelei responded he got it from a friend and had had it for a

9

1  couple of days.  Grantham testified he stopped questioning Uiagalelei because he already had
2  what he needed.  All of this happened within thirty minutes of the initial stop.
3    On cross-examination, Grantham testified that Uiagalelei made these admissions before
4  firearm detectives arrived.  Grantham had knowledge about the female because Grantham had a
5  confidential informant who had told him she was dealing narcotics.  Grantham believed the
6  female had a folding knife on her.  None of the officers drew their firearms when the vehicle was
7  pulled over.  Grantham did not know whether his informant was homeless at the time of the
8  evidentiary hearing.  Grantham's informant was homeless at the time Grantham received the
9  information about the female passenger.  Grantham has moved onto another unit and severed all
10 contact with his informant.
11   O'Connor had contact with his own informant, and O'Connor was the one who requested
12 payment for him.  Grantham did not know what O'Connor gave O'Connor's informant.
13 Grantham was able to hear O'Connor's side of the phone call with O'Connor's informant but
14 was not privy to what the informant was saying.  Grantham was driving, and O'Connor was on
15 the phone.
16 **III.  Testimony of Tamari Yohannes**.
17   Sasha is Ms. Johannes' nickname.  On November 23, 2013, in the evening, she was at the
18 Hard Rock with Uiagalelei gambling.  She did not know when they left the Hard Rock except
19 that it was nighttime.  She did not recall what time it was.  She and Uiagalelei were with two
20 others, the driver she knew as Tommy and another gentlemen.  She, Uiagalelei and Tommy met
21 the third man at the Hard Rock who wanted a ride.  Tommy was driving a Honda.  She sat in the
22 front passenger seat, and Uiagalelei sat behind the driver's seat.  The plan was to give the "other
23 gentleman" a ride to the Palace Station, and Sasha was to be dropped off at the Wynn.  The car
24 was pulled over on Koval after passing the Flamingo by a black-and-white unit and about five or
25 six officers.  The car pulled into a Holiday Inn or Comfort Inn.
26   Ms. Yohannes testified that the occupants of the vehicle were standing around for hours.
27 The officers asked for everyone's identification while they were still in the car.  Minutes later,
28 the occupants of the vehicle were taken out one at a time.  First, the driver was taken out, then

1  Uiagalelei, then the Hispanic male. She was the last to be asked to get out of the car. The
2  officers searched her pockets and asked her to stand in front of the police car. They then
3  interviewed the occupants one by one. She was cuffed as soon as she got out of the car. Two
4  detectives called each occupant to the side to ask questions one by one. She estimated she was
5  questioned ten to fifteen minutes after the car was pulled over by Officer Grantham. Grantham
6  asked her if her name was Sasha and whether she lived at a certain address. She denied that she
7  lived at that address. Grantham said that obviously we have information, just tell me the truth
8  and asked her where the gun was. She responded that she did not know. Grantham told her not
9  to lie and that she was going to prison and told her to return to the front of the patrol car. She
10 was questioned by Grantham and his partner together. She estimated that she was at the scene
11 two-and-a-half to three hours as the officers were searching. The officers would not let her go to
12 the bathroom, and it was freezing cold outside. She did not have a jacket and nearly peed
13 herself. The other occupants were also standing in the front of the car while the police were
14 searching it.

15 She was asked about the gun as soon as they pulled her out. She said she did not see one,
16 and the officers did not show one to her. After about two hours, the officers decided to let her
17 and the other gentleman leave and took the handcuffs off. She realized she did not have her ID
18 and ran back to get it. She had a folding knife in her pocket. One of the officers threw it in the
19 bush and told her to get it and leave.

20 On cross-examination, Ms. Yohannes testified she had recently been arrested for
21 possession of a controlled substance, a quarter of a piece of Xanax, and was also convicted seven
22 years ago for battery and assault. The night before this stop, she was probably gambling at the
23 Tuscany or the Hard Rock. She has been unemployed for a while, but did makeup and hair for
24 people. The night of the stop, she was gambling and had been at the Hard Rock thirty to forty-
25 five minutes. She does not drink and did not have any controlled substances that night. She
26 remembered that night because it was pretty scary. The initial stop was conducted by a squad car
27 and then maybe five or six other vehicles arrived, including a van and a Lincoln. She estimated
28 / / /

that there were maybe fourteen to fifteen officers at the scene—some in civilian clothes with badges.

Yohannes testified that Grantham did not read *Miranda* rights to her. She has had contact with Uiagalelei once or twice from jail. She assumed her jail calls were recorded. She did not speak to Uiagalelei too much about that night but wanted to know why he went to jail. Uiagalelei said that they targeted him. Yohannes did not recall Uiagalelei saying anything about putting the gun in the trunk because he was in a hurry.

## **DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id*. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

**I.     The Traffic Stop.**

In this case, the silver Honda in which Uiagalelei was a passenger was pulled over for a traffic violation. It is undisputed that, although the officers conducted a traffic stop, O'Connor and Grantham were following up on the tip provided by O'Connor's informant that Uiagalelei was a convicted felon in possession of a firearm which was reportedly in the trunk of the vehicle. Both sides agree that reasonable suspicion is all the Fourth Amendment requires to justify a traffic stop. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000) (joining the Sixth, Eighth and Tenth Circuits in holding that the Fourth Amendment requires only reasonable suspicion to justify investigative traffic stops). The Supreme Court and Ninth Circuit define reasonable suspicion as "specific, articulable facts which, together with objective and reasonable inferences, form the bases for suspecting that the particular person detained is engaged in criminal activity." *Id.* at 1105.

A temporary detention of individuals during a traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996).

Reasonable suspicion is based on the totality of the circumstances. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (*en banc*). An officer evaluating whether reasonable suspicion is present is entitled to draw on his or her "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Even reasonable suspicion of a parking violation can justify an investigatory stop of a vehicle. *United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006).

The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimenez,* 500 U.S. 248, 250 (1991). As long as there is an objectively reasonable basis to perform a traffic stop, the stop will be permitted by the Fourth Amendment. *Whren,* 517 U.S. at 813. Subjective intentions play no role in ordinary Fourth Amendment analysis. *Id.* The Supreme Court has been "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Id.* In *Whren,* a unanimous Supreme Court held that a traffic stop was reasonable under the Fourth Amendment where officers had probable cause to believe a traffic violation occurred, even if the ultimate charge was not related to the traffic stop. *Id.* at 808–09. Or, as the Ninth Circuit has articulated its understanding of *Whren's* holding, if officers have reasonable suspicion to conduct a traffic stop, it does not offend the Fourth Amendment even if the stop served some other purpose.

A traffic violation is sufficient to justify an investigatory stop, even if (i) the violation was merely pretextual. *Id. at* 811-12, (ii) the stop departed from the regular practice of a particular precinct, *Id.* at 814-15, or (iii) the violation was common and insignificant, *Id.* at 818-19. In *Choudhry,* the Ninth Circuit applied Whren holding that as long as officers had reasonable suspicion to believe a violation of a traffic code had occurred, the stop was reasonable under the Fourth Amendment and evidence recovered from a stop is admissible. *Choudhry*, 461 F.3d at 1102.

Here, Officer O'Connor's arrest report indicates that he observed the silver Honda turn "north on Koval where it committed a traffic infraction of unsafe turning movement by failing to maintain lane." *See* Exhibit "A" to Motion to Suppress (Dkt. #22). The report did not cite the

1  applicable provision of Nevada law on which Officer O'Connor was relying. Both sides agree
2  that either NRS 484B.223 or NRS 484B.400 must be the traffic code sections upon which the
3  officers relied in making the stop.
4        NRS 484B.223 provides, in pertinent part,

> **Driving on highway, having multiple marked lanes for traffic; additional penalty for violation committed in work zone.**
>     1. If a highway has two or more clearly marked lanes for traffic traveling in one direction, a vehicle must:
>         (a) be driven as nearly as practicable entirely within a single lane; and
>         (b) not be moved from that lane until a driver has given the appropriate turn signal and ascertained that such movement can be made with safety.

      NRS 484B.400 provides, in pertinent part,

> **Required position and method of turning at intersections.** If the driver of a vehicle intends to turn at an intersection and:
>     1. the turn is a right turn, both the approach for the right and the right turn must be made from the right turn lane if the highway has a right turn lane as set forth in subsection 4 of NRS 484B.223, or must be made from the extreme right lane.

      The testimony indicates that the intersection of Koval and Harmon has two northbound lanes and two southbound lanes separated by a median. At the evidentiary hearing, Officers O'Connor and Grantham clarified the traffic maneuver that they observed that led to this traffic stop. Both testified that the driver of the Honda made a wide turn negotiating the right-hand turn onto Koval. The driver went from the right lane to the left lane without signaling to get in the left lane while making the turn. Uiagalelei's written motion to suppress suggests that this maneuver was made because there is a bus stop in the northbound lane east of the intersection and if the bus is stopped in the No. 2 (right) lane, any vehicle turning right from Harmon must move into the No. 1 lane, the lane closest to the median to make the turn. A photocopy of the intersection is attached as Exhibit "C" to the motion and was admitted in evidence at the evidentiary hearing. The photograph depicts a bus at a bus stop east of the intersection. However, there is no evidence in the record that there was a bus at the bus stop that required the driver of the Honda to move from the right lane to the left lane to negotiate a right-hand turn because of the presence of a bus. Defense counsel did not ask this question of either of the

officers. Even if there was a bus in the right lane, a driver would be required to signal a lane change.

The testimony of Officers O'Connor and Grantham is uncontroverted. The driver of the Honda moved from the right lane to the left lane to negotiate a right-hand turn in violation of Nevada law which requires that a driver moving from one lane to another must signal a lane change (NRS 484B.223), and must make a right-hand turn from the right turn lane or the extreme right lane (NRS 484B.400). The court finds the officers had reasonable suspicion to conduct a traffic stop for failing to signal a lane change, and failing to make a right-hand turn from the right turn lane, or the extreme right lane.

## II. Duration of the Traffic Stop/De-Facto Arrest.

Uiagalelei argues that he was under arrest from the minute he was removed from the vehicle. All four occupants of the vehicle were ordered out, placed in handcuffs, and positioned near police cars. Under these circumstances, he argues, any brief investigatory stop had ended and a full blown arrest had taken place. Because the officers lacked probable cause to arrest Uiagalelei, he argues any evidence derived from the subsequent investigation must be suppressed.

For Fourth Amendment purposes, a seizure occurs whenever a reasonable person would believe that he or she is not free to ignore the police presence and go about his or her business. *California v. Hodari D,* 499 U.S. 621, 628 (1991). A seizure occurs when an officer restrains the liberty of a citizen by either physical force or show of authority. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). It is undisputed that Uiagalelei was detained from the moment of the initial traffic stop. Uiagalelei argues his detention amounted to an arrest which was not supported by probable cause and therefore unlawful. The government maintains his initial seizure in the traffic stop was a brief investigatory detention based on reasonable suspicion.

There is no "bright line rule for determining when an investigatory stop crosses the line and becomes an arrest." *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995) (internal citations and quotations omitted). Whether a seizure is an arrest or an investigatory detention is a fact-specific inquiry. *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).

15

A court determining whether a seizure is a temporary detention or an arrest must consider the totality of the circumstances surrounding the encounter between the individual and the police. *Bostick*, 501 U.S. at 439. The court must not only evaluate how intrusive the stop was, but whether the methods used by law enforcement were reasonable given the specific circumstances. *Lambert*, 98 F.3d at 1185.

The Ninth Circuit has held that pointing a weapon at a suspect, ordering him to lie on the ground, handcuffing him, and placing him for a brief period in a police vehicle for questioning does not automatically convert an investigatory detention into an arrest requiring probable cause. *Allen*, 66 F.3d at 1056. Police officers are entitled to use reasonable methods to protect themselves and others in potentially dangerous situations. *Id.* Police are not required to use the least intrusive means of responding to an exigent situation, and the relevant inquiry is always one of reasonableness under the circumstances. *Id*. at 1056-1057 (internal quotations and citations omitted).

Uiagalelei relies on a number of factors in arguing that his detention went beyond a valid investigatory stop and constituted a full blown arrest. He was ordered from the vehicle, handcuffed, directed where to sit or stand, and detained for several hours. The court finds that the circumstances surrounding his initial removal from the vehicle, being placed in handcuffs, and initially detained were objectively reasonable for purposes of the Fourth Amendment. Uiagalelei does not claim that officers drew their weapons at any point during the encounter. Officers O'Connor and Grantham testified that no weapons were drawn during the encounter. All of the occupants were ordered to get out of the car and placed in handcuffs because of the information the officers had from O'Connor's informant that Uiagalelei was a convicted felon in possession of a gun who had placed something in the trunk of the car that was stopped.

The officers quickly acted to determine the identity of the driver and all of the passengers, questioning one-by-one beginning with the driver. There is a dispute in the record concerning how long Ms. Johannes was detained before she was uncuffed and released after questioning. Ms. Johannes testified that she was at the scene for hours. Grantham testified he believed she was uncuffed and released approximately 25 minutes after the stop. However, she

16

1 corroborated the testimony of Officers O'Connor and Grantham that each of the four occupants
2 of the vehicle were questioned one by one and that Uiagalelei was questioned last. Ms. Johannes
3 estimated she was questioned ten to fifteen minutes after the car was pulled over. Her testimony
4 is consistent with the officers' testimony that Uiagalelei was questioned last approximately
5 twenty-five to thirty minutes after the initial traffic stop.
6       The officers were quickly aware that the driver of the vehicle had one or more
7 outstanding bench warrants and placed him under arrest. The officers then interviewed the
8 female passenger and Hispanic male passenger and determined they had no outstanding
9 warrants. Both were uncuffed and released at the scene after questioning.
10       The police report indicates that the traffic stop was made at 10:57 p.m. The officers
11 testified the stop was made a minute or two before 11:00 p.m. The decision was made to tow
12 and impound the Honda when it was learned that the driver was not the registered owner of the
13 vehicle, and therefore, not legally authorized to release it to anyone else. Pursuant to department
14 policy, an inventory search was conducted before the vehicle was towed from the scene. Officer
15 Grantham testified that he did a quick inventory of the vehicle. O'Connor estimated the firearm
16 was located fifteen to twenty minutes after the initial stop. Grantham initially looked in the
17 interior of the vehicle, got under the seats, and then the trunk. He estimated the initial search
18 took approximately ten minutes, and testified that the inventory search was done before he
19 interviewed Uiagalelei. The gun was found in the trunk under the spare tire.
20       The CAD report and unit logs were referred to during the testimony. This call changed
21 from a traffic stop to a code 413 (firearm) at 23:14:35, and the CAD report indicates that
22 *Miranda* warnings were administered to Uiagalelei at 11:25 p.m. The timelines in the reports
23 and the officers' testimony are consistent. The officers testified the gun was found 15-20
24 minutes after the stop. The reports document the call reporting the gun had been found was
25 made approximately sixteen to seventeen minutes after the initial traffic stop was made.
26       The court finds Uiagalelei was initially seized in an investigatory detention based on
27 reasonable suspicion. The brief investigatory detention developed probable cause for his arrest.
28 Uiagalelei does not claim officers lacked authority to conduct an inventory search of the vehicle,

or that he has standing to challenge the vehicle search directly. Absent some type of possessory interest, a passenger has no reasonable expectation of privacy in a car that would permit him to challenge a search of a car. *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000). Uiagalelei may, however, challenge the initial stop of the vehicle, and if the stop violated his own Fourth Amendment rights to be free from an unreasonable search or seizure, seek suppression of evidence recovered and statements obtained from him under the fruit of the poisonous tree doctrine. *Id.*

The court finds that the police did not have probable cause to arrest Uiagalelei until after the gun was found, Uiagalelei was *Mirandized,* and made incriminating statements that he was holding the gun found in the trunk for a friend. Uiagalelei does not dispute that he received and waived *Miranda* warnings, or claim that his statements were involuntary. Rather, he claims that he was arrested from the point of his initial encounter, and therefore, his statements should be suppressed under the fruit of the poisonous tree doctrine. It is undisputed the police were aware, prior to questioning Uiagalelei that he was a convicted felon. The formal arrest was made by a detective in the Firearms Division because LVMPD policy requires a firearms detective to recover firearms in felon in possession cases. However, it is clear that after Uiagalelei made incriminating admissions, the officers had probable cause to arrest him for felon in possession. Police developed probable cause for Uiagalelei's arrest within thirty minutes of the stop. The court finds that the length and scope of his detention was justified under the circumstances in the record.

### III.    Conclusion.

The court finds the officers had reasonable suspicion to conduct a traffic stop of the driver for making an illegal right-hand turn. It was objectively reasonable for officers to remove all of the occupants of the vehicle and to briefly detain them pending investigation based on information received from O'Connor's informant that Uiagalelei was a convicted felon who had a gun and had placed something in the trunk of the car. Uiagalelei was detained in an investigatory detention until officers developed probable cause to arrest him shortly after 11:25 p.m., less than thirty minutes after the initial stop, when he made incriminating statements that he

was holding the gun found in the trunk of the car for a friend.  It is uncontroverted that he received and waived *Miranda* warnings before making these admissions.  Officers were aware that he had a felony conviction and therefore had probable cause to arrest him after he made these admissions, although the formal arrest was not made until firearms detectives arrived to recover the gun.  Uiagalelei's Fourth Amendment rights were not violated under the totality of the circumstances surrounding his initial detention, the discovery of the firearm in the trunk of the vehicle, his onsite questioning or subsequent arrest.

For the reasons stated,

**IT IS RECOMMENDED** that the Motion to Suppress Evidence for Fourth Amendment Violations (Dkt. #22) be **DENIED**.

DATED this 26th day of August, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE